IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CHRISTOPHER NICHOLAS EBERT, | |
| Plaintiff, | 8:14-CV-242 |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on the denial, initially and upon reconsideration, of the plaintiff Christopher Nicholas Ebert's application for supplemental social security income benefits under Title XVI of the Act, 42 § 1381, *et seq*. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Commissioner's decision is affirmed.

## I. PROCEDURAL BACKGROUND

Ebert applied for supplemental social security income benefits on January 14, 2011. T100.[1] His claim was denied initially on May 18, 2011, T104–07, and upon reconsideration on August 12, 2011, T116–19. Ebert appealed and requested a hearing from an administrative law judge (ALJ). T125. The ALJ held three hearings on the matter. T31, 41, 66. The first hearing took place on November 27, 2012. T31. It was continued to provide the medical expert with an additional exhibit. T37. The second hearing took place on December 4, 2012. T41. That hearing was continued to obtain a statement from Ebert's treating cardiologist as to whether he was a candidate for heart transplant. T65. The third hearing took place on March 20, 2013. T66. The medical expert from the prior two hearings was unavailable, so a different medical expert testified at the third hearing. T68. In a decision dated April 9, 2013, the ALJ found that Ebert was not disabled as defined under 42 U.S.C. § 1382c, and therefore not entitled to benefits. T25.

---

[1] All citations to the administrative record (filings 11-1 through 11-7 and 12-1 through 12-4) are given as "T [Transcript]" followed by the page number.

1

1. <u>Sequential Analysis</u>

Disability, for purposes of the Social Security Act, is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(3)(A).

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At step one, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). If the claimant has engaged in substantial gainful activity, he will be found not to be disabled; otherwise, at step two, he has the burden to prove he has a medically determinable physical or mental impairment or combination of impairments that significantly limits his physical or mental ability to perform basic work activities. *Id.*

At step three, if the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, he is automatically found disabled and is entitled to benefits. *Id.* Otherwise, the analysis proceeds to step four. But first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is what he can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). At step four, the claimant has the burden to prove he lacks the RFC to perform his past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his past relevant work, he will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

2. <u>The ALJ's Findings</u>

Ebert alleges disability primarily as a result of cardiomyopathy. T378. He initially alleged an onset date of November 1, 2010, but later amended it to January 14, 2011. T362, 44. At that time, Ebert was 28. *See* T362.

At step one, the ALJ found that Ebert had not engaged in substantial gainful activity following his alleged onset date. T16. Next, at step two, the ALJ found that Ebert's dilated cardiomyopathy and congestive heart failure were severe impairments. T16. At step three, the ALJ found that Ebert had no impairment that met or medically equaled a listed impairment. T17. The

ALJ then determined that Ebert had the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), i.e., lifting and carrying 10 pounds occasionally and less than 10 pounds frequently, sitting 1 hour at a time for a total of 6 hours in an 8-hour workday followed by a break of 2 to 4 minutes standing, standing 1 hour at a time for a total of 2 hours in an 8-hour workday, and walking 2 hours at a time for a total of 4 hours in an 8-hour workday. T17. Further, the ALJ found that the claimant could less than occasionally balance, stoop, kneel, crouch, and crawl; occasionally climb stairs and ramps, work in extreme cold and heat, and work with exposure to dust, odors, fumes, and pulmonary irritants; he could never climb ladders, ropes, and scaffolds, work at unprotected heights, work around moving mechanical parts, or drive commercially; and he would have no problem with vibrations. T17.

At step four, the ALJ found, based upon the testimony of a vocational expert, that Ebert could not perform any past relevant work. T23. At step five the ALJ found that, based on the vocational expert's testimony, Ebert could perform jobs that existed in significant numbers in the national economy. T24. So, the ALJ found that Ebert was not disabled. T25.

On June 20, 2014, the Appeals Council of the Social Security Administration denied Ebert's request for review. T1. Ebert's complaint (filing 1) seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

On November 22, 2010, about 2 months before the alleged onset date, Ebert went to the emergency room at Immanuel Medical Center for abdominal pain, fever, chills, vomiting, diarrhea, and body aches. T502. He was diagnosed with pneumonia and probable gastritis. T503. His chest was x-rayed, and Barry L. Fanders, M.D. noted that "[t]he appearance of the chest suggests atypical pneumonia, or interstitial pulmonary edema." T504. Ebert notes that pulmonary edema is often caused by congestive heart failure, though he was not diagnosed with heart failure at that time. Filing 17 at 6.

On December 25, 2010, Ebert was hospitalized after reporting chest pressure, weight gain, orthopnea, and paroxysmal nocturnal dyspnea. T463. He had a syncopal episode while shoveling snow in the days before he went to the hospital. T463. He also reported that he had Burkitt's lymphoma as a child. T463. He had undergone chemotherapy for that condition, and was in remission. T463.

Ebert was found to have cardiomyopathy with an ejection fraction of less than 20% with moderate to severe mitral regurgitation and severe tricuspid regurgitation. T469. Jeffrey Mahoney, M.D. implanted a single-

chamber implantable cardioverter defibrillator (ICD). T491. After the operation, Mahoney diagnosed Ebert with severe cardiomyopathy, with a left ventricular ejection fraction of less than 20%, baseline QRS duration of less than 120 msec., congestive heart failure New York Heart Classification III to V, and abrupt syncopal episode/probable aborted sudden cardiac death. T491. During his hospital stay, Ebert also underwent procedures to treat conditions unrelated to his cardiomyopathy: a laparoscopic cholecystectomy, a laparoscopic bilateral inguinal hernia repair, and the removal of a subcutaneous cyst. T469. Ebert was discharged from the hospital on January 4, 2011. T469.

About a week later, on January 10, 2011, Ebert had a follow-up appointment with Maman Ali, M.D. T458. Ali noted that Ebert was "doing well." T458. Ali prescribed carvedilol, spironolactone, enlapril maleate, digoxin, and oxycodone. T459. On January 17, Ebert had another follow-up appointment with his cardiologist, S. George Sojka, M.D. T528. Sojka noted that Ebert complained of some chest pain since the operation. T528. Ebert had gotten in an argument with a friend, and the friend had left him several miles outside of town, forcing Ebert to walk. T528. Afterward, Ebert said he had chest pressure persisting through the entire night. T528. Otherwise, however, he reported only occasional chest pain. T528. Sojka planned to have Ebert complete a stress echocardiogram in order to determine why he was continuing to experience chest pains, which Sojka thought were "somewhat atypical." T529. On January 21, Ebert had a follow-up appointment with Mahoney regarding his ICD. T530. Mahoney noted that at this appointment, Ebert reported "he ha[d] gotten along quite well." T530. Mahoney concluded Ebert was healing well after the operation. T530. On February 3, Ebert had another follow-up appointment at Douglas County Health Center. T612. He reported a "little" chest pain and palpitation, but otherwise voiced no complaints. T612.

On February 5, 2011, Ebert was hospitalized for 3 days after experiencing a hypovolemic syncopal episode secondary to dehydration. T552. Ebert reported nausea and dizziness, but no chest pain. T559. Shibu Phillip, M.D. conducted an interrogation of Ebert's ICD. T569. He found that Ebert had on the previous day had an episode of "SVT," or supraventricular tachycardia, but did not believe that it contributed to the syncopal episode. T568. Instead, Phillip concluded that the episode was likely a result of Ebert's low blood pressure, possibly caused by one of his medications. T569. His medications were adjusted. T569. Ebert improved overnight, and "did very well" with cardiac rehab. T553. In addition, during Ebert's hospital stay his doctors obtained a psychiatric consult for him because he "appeared to be depressed." T553. He was diagnosed with depression, adjustment disorder,

4

and a history of polysubstance abuse. T553. On February 8, doctors determined he was stable and discharged him. T553.

On February 17, 2011, Ebert visited the Douglas County Health Center for a follow-up appointment. T611. According to his assessment, he had no chest pain, dizziness, or other complaints on that date. T611. On March 3, he visited the Douglas County Health Center for another follow-up, and again reported no complaints. T610. On March 4, Ebert saw Mahoney at the electrophysiology clinic. T584. Mahoney interrogated Ebert's ICD, and found that the device was functioning normally and that Ebert had had no significant arrhythmias. T584. Mahoney stated that since Ebert's medications had been adjusted, his hypotension had resolved, and that Ebert denied syncope, near-syncope, dizziness, chest pain, palpitations, orthopnea, or paroxysmal nocturnal dyspnea. T584.

On April 4, 2011, Ebert visited the Douglas County Health Center. T609. At that appointment, he said he had a "little" chest pain. T609. His doctor, Nosrat Massih, M.D., noted that while Ebert was not in congestive heart failure, his ejection fraction was low. T609. Massih adjusted Ebert's medications. T609. He suggested that Ebert's cardiomyopathy could have been caused by past cocaine use, and said that Ebert's condition could improve over time. T609. On June 21, Ebert's echocardiogram results showed "some improvement" in his ejection fraction. T607. On June 27, Ebert visited the Douglas County Health Center for a follow-up and reported a "little" chest pain. T607. On July 20, the Douglas County Health Center renewed one of Ebert's prescriptions on his request. T606.

In the meantime, on May 11, 2011, Jerry Reed, M.D., the State Agency medical consultant, reviewed Ebert's medical records for the purpose of determining Ebert's eligibility for social security benefits. T591–98. He concluded that Ebert could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand or walk about 6 hours out of 8 in a normal work day, sit about 6 hours out of 8 in a normal work day, and would have no limitation on pushing and pulling. T592. Steven G. Higgins, M.D. affirmed this conclusion on reconsideration on August 10 after reviewing updated evidence, noting that the initial finding "accommodate[d] duration and the limitations that could reasonably be expected at 12 months" after the alleged onset date. T619.

After July 20, 2011, there is a gap in Ebert's treatment record until December 20, when he deliberately overdosed on his girlfriend's Citalopram after the two had a break-up. T660. His overdose resulted in a seizure, confusion, tremors, and an acute kidney injury, which improved during his stay at the hospital. T660, 667. Paula Jo Malin, M.D. diagnosed him with delirium, mood disorder, history of major depressive disorder, and possible

5

depression secondary to substance misuse. T681. In addition, Ebert tested positive for amphetamines and opiates. T702. He indicated to hospital staff that he was willing to participate in a treatment program for his methamphetamine use. T661. The psychiatrists at the hospital later determined that Ebert was not eligible for inpatient treatment. T661. After Ebert's condition stabilized, he was discharged on December 28. T660.

On March 27, 2012, Ebert visited the emergency room for respiratory issues, and was diagnosed with strep pharyngitis. T758. On May 4, Ebert visited Jeffrey Rapp, M.D. to establish care, get his medications refilled, and address chest pain. T626. Ebert reported that the chest pain was ongoing, that it was not exertional, and that it was worsening. T626. He additionally reported dyspnea, fatigue, and palpitation. T626. He had not been taking his medications for 4 months because he did not have insurance. T626.

On June 12, 2012, Ebert visited a health clinic for sleep apnea and non-restorative sleep. T621. After Ebert underwent a sleep study on July 25, he was diagnosed with mild non-positional obstructive sleep apnea. T631. Rapp concluded that he "may respond simply to improving total sleeptime and sleep hygiene," or "an oral appliance," and that if those measures failed, he would consider other treatment options. T631.

On August 22, 2012, Ebert initiated mental health treatment with Vithyalakshmi Selvaraj, M.D. T769. Selvaraj diagnosed major depression, recurrent, alcohol dependence in remission, and methamphetamine dependence in remission, with a Global Assessment Functioning (GAF) score of 50. T771. Selvaraj prescribed Zoloft and provided cognitive behavioral therapy. T771.

A short time later, on August 27, 2012, Ebert saw cardiologist Banthit Khankirawatana, M.D. T759. Ebert reported frequent fatigue, dyspnea on exertion, and daily chest pain lasting for 2 hours at a time, and not associated with physical exertion. T759. Khankirawatana conducted an echocardiogram, which showed that Ebert had a left ventricle ejection fraction of 15-20%. Khankirawatana stated that while Ebert was on appropriate medications for cardiomyopathy, his ejection fraction had shown no signs of improvement. Khankirawatana stated that he believed Ebert's cardiomyopathy was nonischemic (non-cardiac) in nature, and said that if his symptoms worsened, he should be considered for cardiac transplantation. T760.

Ebert had a follow-up mental health appointment with Selvaraj on September 12, 2012. He reported that his mood was "much better" since initiating Zoloft, and that he had had no side effects. T767. Selvaraj prescribed Wellbutrin, a smoking cessation aid, and assessed Ebert with a GAF of 55. T768. On November 14, Ebert visited Selvaraj again. This time, he reported a low mood due to the death of his father the week before. T765.

However, he stated that he had not used methamphetamine in 2 months, and that he had reduced his smoking. T765. Selvaraj provided supportive psychotherapy and increased his Zoloft dosage. T766. Selvaraj gave Ebert a GAF of 50. T766.

On January 3, 2013, Ebert had a cardiology appointment with one of Khankirawatana's colleagues, Edmund Fiksinski, M.D. T761–62. Fiksinski stated that Ebert's condition had remained stable since his last visit. T761. Ebert reported that he could walk for a block without noticeable shortness of breath, that his legs did not swell, and that he had no shortness of breath without activity. T761. Additionally, Ebert reported that he had no paroxysmal nocturnal dyspnea, orthopnea, sensation of irregular heart rhythm or chest discomfort. T761. Fiksinski found that "[c]linically, Mr. Ebert remains free of signs of congestive heart failure." T762. He ordered a limited echocardiogram, which revealed that Ebert's left ventricle ejection fraction was 20-25%. T763. He also sent Ebert to a pacemaker clinic for ICD interrogation. T762. This was Ebert's final medical appointment before his administrative hearing.

## III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.*

## IV. DISCUSSION

The plaintiff appeals the ALJ's order on three grounds. First he argues that the ALJ's RFC findings were not based on substantial evidence because she incorrectly weighed the medical expert testimony. Filing 17 at 17. Second, he argues that the ALJ incorrectly determined that he was not entirely credible. Filing 17 at 23. Third, he argues that the ALJ's RFC findings were not based on substantial evidence because they failed to account for Ebert's depression. Filing 17 at 28.

1. <u>The ALJ's weighing of medical expert testimony was based on substantial evidence</u>

Ebert contends that the ALJ's determination that Ebert's cardiac impairment did not meet or equal Social Security Listing § 4.02 was faulty because the ALJ incorrectly gave the conclusions of the medical expert who testified at the third hearing, David West, M.D., more weight than the conclusions of the medical expert who testified at the second hearing, Carl Leigh, M.D. Filing 17 at 17.

Chronic heart failure meets listing § 4.02 when the requirements of both § 4.02A and § 4.02B are satisfied. 20 C.F.R.§ 404, Subpt. P, App. 1. § 4.02. One way to satisfy § 4.02A is to produce "medically documented presence" of "[s]ystolic failure . . . with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure)." § 4.02. Both Leigh and West concluded that Ebert met this requirement during the relevant time period. T60, T77.

Section 4.02B, then, requires that the systolic failure referred to in § 4.02A results in one of several enumerated outcomes. Leigh concluded that Ebert's heart failure resulted in the outcome listed in § 4.02B1: "[p]ersistent symptoms . . . which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual." T60, § 4.02. West, in contrast, agreed that an exercise test would present a significant risk to Ebert, but believed that Ebert's systolic failure did not "seriously limit" his daily activities. T77–78. West additionally concluded that Ebert's condition had not resulted in any of the other listed outcomes in § 4.02B. T78.

The ALJ concluded that Ebert had not met the requirements of § 4.02B1. T17. In reaching this conclusion, the ALJ gave more weight to the opinion of West than to the opinion of Leigh. *See* T17. In support of this decision, the ALJ noted that Leigh did not elaborate on why he believed Ebert met § 4.02B1, and did not specifically address Ebert's daily activities. T17. West, on the other hand, did specifically explain his belief that Ebert's daily living activities were not "seriously limit[ed]" by his condition. T17; § 4.02. Additionally, the ALJ noted that while both Leigh and West were cardiologists, only West was board-certified in cardiology. T17. Ebert contends that the ALJ should have relied more heavily on Leigh's testimony than on West's. Filing 17 at 17.

8

"It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians." *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007). The weight given to non-treating, non-examining sources depends in part "on the degree to which they provide supporting explanations." *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(3)). In addition, the more consistent an opinion is with the record as a whole, the more weight it is given. 20 C.F.R. § 404.1527(c)(4). And more weight is generally given to the opinion of a specialist about medical issues related to the area of specialty. 20 C.F.R. § 404.1527(c)(5). Finally, the ALJ may assign weight based on any other relevant factor, including "the amount of understanding of our disability programs and their evidentiary requirements" a medical source has, and the extent to which a medical source is familiar with the case. 20 C.F.R. § 404.1527(c)(6).

First, Ebert takes issue with the ALJ's reliance on the fact that Leigh did not elaborate on Ebert's daily activities, while West did. Filing 17 at 18. According to Ebert, this analysis was disingenuous because the ALJ did not ask Leigh to explain further. Filing 17 at 18. Additionally, Ebert points out that the ALJ continued the second hearing only to obtain a statement from Khankirawatana as to whether Ebert was a candidate for heart transplant. Filing 17 at 18. If Ebert was a candidate for heart transplant, Leigh believed Ebert would meet the listing for the entire alleged period of disability; otherwise, Leigh believed Ebert would meet the listing only for December 1, 2010 to December 28, 2011. T60, 61. Thus, according to Ebert, at the third hearing the ALJ should have considered, based on information from Khankirawatana, only whether Ebert could meet listing § 4.02 for the entire period, or just from December 1, 2010 to December 28, 2011. *See* filing 17 at 18. But the mere fact that the ALJ seemed to find Leigh's conclusion persuasive at the second hearing does not preclude her from later eliciting testimony from another medical expert, and revising her opinion based on new or additional testimony. As previously noted, resolving disagreement among medical sources is the province of the ALJ, and that is just what the ALJ did here. *See Kirby*, 500 F.3d at 709.

Next, Ebert argues that Leigh did, in fact, provide support for his opinion. Filing 17 at 19. Although Leigh did not specifically discuss Ebert's ability to engage in daily activities, Leigh did refer to evidence in the medical record that, Ebert argues, supports Leigh's implicit conclusion that Ebert's ability to engage in daily activities was seriously limited. Filing 17 at 19. It is true that "[t]he more a medical source presents relevant evidence to support an opinion" the more weight an ALJ is entitled to give that opinion. 20 C.F.R. § 404.1527(c)(3). However, the Social Security regulations also specify that "[t]he better an explanation a source provides for an opinion," the more

9

weight an ALJ may give that opinion. *Id.* Here, although Leigh cited some evidence to support his opinion, he did not provide an explanation as to why he felt that evidence demonstrated that Ebert met the requirements of § 4.02B1. *See* T60. West, on the other hand, provided both citations and an explanation for his opinion. T77–78. Thus, the ALJ did not err in giving Leigh's opinion less weight than West's.

Finally, Ebert contends that because Leigh has "extensive familiarity with Social Security rules, regulations and listings," his opinion should have been given more weight than West's. Filing 17 at 19. According to Ebert, West demonstrated that he was "unfamiliar with the methodology of forming an appropriate RFC." Filing 17 at 21. First, Ebert points to an exchange between the ALJ and West during the third hearing, in which West— according to Ebert—confused "meeting" and "equaling" a Social Security listing. Filing 17 at 19. Second, Ebert highlights that at one point during the hearing, West "expressed his puzzlement" when the ALJ asked him what Ebert would have to do after sitting for an hour. Filing 17 at 21. In the portion of the transcript cited, West said, "So I've always been puzzled by Social Security. I believe that he should stand every hour. In fact, I believe most of us should stand every hour." T70.

The Court is not persuaded that these comments demonstrate that West is unfamiliar with the Social Security regulations. But even if the Court were to reach that conclusion, that is not sufficient to render the ALJ's reliance on his testimony "deficient and not supported by substantial evidence on the record as a whole." *See* filing 17 at 21. The "amount of understanding of our disability programs" is just one of several factors the ALJ may consider in determining how much weight to assign to a medical source's opinion. 20 C.F.R. § 404.1527(c)(6). And an administrative decision is not subject to reversal simply because some evidence might support a different conclusion. *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). In sum, the ALJ's decision to give Leigh's conclusions more weight than West's was proper under 20 C.F.R. § 404.1527.

2. The ALJ's credibility determination was supported by substantial evidence

Ebert additionally argues that the ALJ's conclusion that Ebert's complaints were not credible was improper because the ALJ incorrectly determined that Ebert's complaints were inconsistent with the record as a whole. Filing 17 at 23.

In finding that a claimant's subjective complaints are not credible, an ALJ must give full consideration to "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration,

frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must "must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). And though the ALJ need not specifically discuss each *Polaski* consideration, the ALJ should "acknowledge[] and consider[] the factors." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009). In reviewing a credibility determination, "[i]f an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003).

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." T18. However the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual functional capacity." T18. The ALJ explained that Ebert's "complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone." T20.

The ALJ relied on several different pieces of evidence in determining that Ebert's subjective complaints were not credible. First, she observed that the longitudinal medical evidence did not support Ebert's complaints. T21. At several medical appointments, Ebert did not report the severe symptoms he now alleges. Between February 25, 2011 and May 4, 2012, he reported either no or "little" chest pain, shortness of breath, and edema. *See* T21. The ALJ noted that he did report chest pain and shortness of breath on May 4, 2012, but observed that at that time, Ebert had been off his medications for 4 months. T21. Finally, the ALJ considered that on August 27, 2012, Ebert reported fatigue and dyspnea, but no chest pain. T21, 759. However, the ALJ noted that at his January 3, 2013 follow-up, Ebert reported stability in his condition, with no shortness of breath without activity or chest discomfort. T21. The ALJ also identified several gaps in the record in which Ebert sought no medical treatment of any kind: from June 27, 2011 to December 20, 2011; from December 28, 2011 to March 27, 2012; from May 4, 2012 to July 25, 2012; and from August 27, 2012 to January 3, 2013. T21.

Next, the ALJ observed that although Ebert reports that he restricts his daily activities, no doctor seems to have suggested that he do so, and both the state agency consultants believed he could perform light work. T22. And, as previously discussed, the ALJ credited West's opinion that Ebert's symptoms did not seriously limit his daily activities. T22–23. The ALJ also

11

noted her obligation to consider Ebert's mother's statement that Ebert's condition restricted his daily activities. T23. However, she granted it only some weight, "since it shows that he can prepare his own meals and attend to personal grooming needs." T23.

Ebert takes issue with some of the inconsistencies the ALJ relied upon in determining that his subjective complaints were not credible, arguing that the ALJ should have drawn different inferences from the record. *See* filing 17 at 23–27. However, Ebert's criticisms are not persuasive. Ebert has identified no *reversible* error, and the ALJ's credibility determination is clearly well-supported by the evidence, most of which Ebert has not meaningfully challenged. *See Gregg,* 354 F.3d at 714.

Finally, Ebert argues that other evidence in the record is consistent with his subjective complaints, including: his hospitalizations; one cardiology appointment at which he reported chest pain, dyspnea, and fatigue; the statement of Ebert's mother; Ebert's Social Security questionnaires, in which he reports shortness of breath and chest pain; and West's statement that Ebert's limited cardiac functioning would be likely to produce significant fatigue. Filing 17 at 25. But the ALJ's credibility determination is not reversible "simply because some evidence may support the opposite conclusion." *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir. 1994). The Court finds that the ALJ's credibility determination is substantially supported by the evidence.

3. The ALJ did not err by not accounting for Ebert's depression

Finally, Ebert argues that the Commission failed to appropriately account for Ebert's depression in determining his RFC. Filing 17 at 28. Ebert did not allege any mental impairments at the time of his application for Social Security benefits. *See* T378. Nor did Ebert's representative raise the possibility of a mental impairment at any of the hearings. And at the second hearing, when the ALJ asked the representative if she was arguing that Ebert met or equaled any listings, she responded that they would argue Ebert met § 4.02, and did not mention any mental health listings that Ebert might meet. T44. Ebert argues that nonetheless, the ALJ failed in her obligation to fully develop the record with respect to his mental impairments, and the Appeals Council failed to consider new evidence he provided regarding his depression. Filing 17 at 29, 30.

First, Ebert argues that although he did not raise the possibility of a mental health impairment in his application or at the hearings, the ALJ had an obligation to develop the record further with respect to Ebert's mental health. Filing 17 at 29. At the time of Ebert's hearing, the evidence before the ALJ included records of Ebert's December 2011 hospitalization following a

suicide attempt, records that referred to a previous suicide attempt, and records that during his February 2011 hospitalization, Ebert was diagnosed with depression and adjustment disorder. *See* T16, T19, T29. However, the records relating to Ebert's three mental health treatment appointments in 2012 were not provided to the ALJ. T29. Ebert provided those records for the first time to the Appeals Council with his Request for Review. T29.

The Eighth Circuit has held that an ALJ has no duty "to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Gregg*, 354 F.3d at 713 (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)). Thus, for example, in *Kitts v. Apfel*, the Eighth Circuit held that where the claimant did not allege a mental impairment in her application or at the hearing, the ALJ was not on notice of a need to develop the record further, even though the record showed that the claimant had been diagnosed with anxiety and prescribed anti-anxiety medication. 204 F.3d 785, 786 (8th Cir. 2000). Because Ebert did not allege disability based on mental impairments in his application for benefits, nor during his administrative hearing, the ALJ fulfilled her duty to fully develop the record.

Second, Ebert argues that the Appeals Council had an obligation to consider the new evidence relating to Ebert's three mental health treatment appointments, and that it failed to do so. Filing 17 at 30. Social Security Regulations require that the Appeals Council "evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). According to Ebert, "[t]here is nothing in the decision of the Appeals Council which indicates that . . . regulation was followed," and "it is clear that this case should have been, at a minimum, remanded to the ALJ for proper consideration of the appropriate psychiatric limitations." Filing 17 at 30.

However, the letter that the Appeals Council sent to Ebert notifying him of the denial of his request for review did, in fact, state, "In looking at your case, we considered the reasons you disagree with the decision *and the additional evidence* listed on the enclosed Order of Appeals Council." T2 (emphasis supplied). The Order of Appeals Council lists exhibit 16E, a memorandum from Ebert's attorney, and 15F, "[m]edical records from Alegent Creighton Clinic, dated August 22, 2012 through November 14, 2012." T4. Clearly, the Appeals Council considered the new evidence at issue. And where "it is clear that the Appeals Council has considered newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994). Therefore,

the Commissioner did not err in determining Ebert's RFC without reference to his alleged mental impairments.

## V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Ebert. The Court finds that the Commissioner's decision was supported by substantial evidence and should be affirmed.

THEREFORE, IT IS ORDERED:

1.  The Commissioner's decision is affirmed;

2.  This case is dismissed;

3.  The parties shall bear their own costs; and

4.  A separate judgment will be entered.

Dated this 15th day of January, 2016.

BY THE COURT:

John M. Gerrard
United States District Judge